# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| United States of America ex rel. ) | |
| JASON STRONG, ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| vs. ) | Case No. 07 C 435 |
| ) | |
| DONALD GAETZ, Warden, ) | |
| Menard Correctional Center, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

A Lake County jury convicted Jason Strong of first degree murder, and a judge sentenced him to forty-six years in prison. Strong, who is incarcerated at Menard Correctional Center, has petitioned the Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The respondent, Warden Donald Gaetz, moved the Court to dismiss Strong's petition as time-barred. The Court denied Gaetz's motion in January 2008. *United States ex rel. Strong v. Hulick*, 530 F. Supp. 2d 1034 (N.D. Ill. 2008). Gaetz then moved to reconsider. The Court determined that Gaetz's motion required an evidentiary hearing and appointed counsel to represent Strong. The Court held an evidentiary hearing in late March 2009.

## Background

Strong was convicted and sentenced in 2001. The Illinois Appellate Court affirmed his conviction on direct appeal, and the Illinois Supreme Court denied his

petition for leave to appeal (PLA) on February 5, 2003. Strong did not file a petition for certiorari to the United States Supreme Court. The time for doing so expired on May 6, 2003.

On July 18, 2003, Strong filed a *pro se* petition for post-conviction relief in state court. The trial court denied the petition. Strong appealed, but the Illinois Appellate Court affirmed. The Illinois Supreme Court denied Strong's PLA on January 25, 2006. Strong filed his federal habeas corpus petition just under one year later, on January 23, 2007.

Assuming – as ordinarily would be the case – the one-year time clock for Strong to file a federal habeas corpus petition began to run on May 6, 2003 (the date the deadline expired for filing a petition for certiorari on direct review), seventy-three days ran off the clock between that date and July 18, 2003, when Strong filed his state post-conviction petition. Another 363 days ran between the date the Illinois Supreme Court denied Strong's post-conviction PLA and the date he filed his federal habeas corpus petition. If that time is added to the time that ran before Strong filed his state post-conviction petition, the total is well over one year.

As indicated earlier, Gaetz moved to dismiss Strong's petition as time-barred. Strong replied that he had not understood that the time between the completion of his direct appeal and the filing of his post-conviction petition counted against the one-year deadline. In this regard, Strong was in the same boat as many Illinois prisoners. It is rather common for prisoners to file, as Strong did, just under one year after completion of collateral review. Such petitions are typically untimely because, as a general rule, enough time ran before the inmate sought post-conviction relief in state court to make

the total interval more than one year. Simple ignorance of the law in this regard, however, does not excuse late filing, even if the misunderstanding results from negligence on the part of the prisoner's attorney. *See, e.g., Arrieta v. Battaglia*, 461 F.3d 861, 867 (7th Cir. 2006) ("Mistakes of law or ignorance of proper legal procedures are not extraordinary circumstances warranting invocation of the doctrine of equitable tolling."); *Modrowski v. Mote*, 322 F.3d 965, 968-69 (7th Cir. 2003) (attorney negligence is not ground for equitable tolling).

In opposing dismissal of his petition, however, Strong argued that he had been unable to get to the Menard prison law library, where he could have found out how the habeas corpus statute of limitations works. *See Moore v. Battaglia*, 456 F.3d 504, 507-08 (7th Cir. 2007) (suggesting that lack of access in prison to habeas corpus statute of limitations might prevent statute of limitations from running). Strong contended that access to the Menard law library is strictly controlled and depends in significant part upon whether the prisoner has an imminent filing deadline. He asserted that after his post-conviction appeal was completed, a prison law clerk (either a prison employee or a prisoner whose position was conferred by prison authorities) told him that he had a year to file his habeas corpus petition. As a result, he contended, he believed his deadline was further in the future than Gaetz contended. Due to law library access rules, Strong argued, he could not have gotten law library access as a prisoner with an imminent deadline. This, combined with prison lockdowns that prevented all prisoners from going to the law library and created a visitation backlog following the lockdowns, prevented him from getting to the library in enough time to file his habeas corpus petition by the deadline argued by Gaetz.

3

The Court denied Gaetz's motion to dismiss Strong's petition. The Court determined that Strong had shown that he received bad advice about the deadline

> that came from a person who – based on reasonable inferences from the evidence – acted pursuant to authority conferred upon him by the state. And . . . prison staff rationed access to the law library based upon their understanding – or in Strong's case, their misunderstanding – of the particular prisoner's filing deadline. In short, Strong's perception of his filing deadline was created or at least significantly influenced by personnel who, albeit unwittingly, had the ability to prevent him from learning the truth.

*Strong*, 530 F. Supp. 2d at 1038 (footnote omitted). The Court determined that because Strong "was not considered to fall within the category of prisoners with 'imminent' deadlines . . ., [he] had no access at all to law library materials during lockdown periods. He was, as a result, unable to determine for himself during those periods how the statute of limitations worked." *Id.* at 1039. Based upon evidence concerning time periods during which Menard prison was on lockdown, the Court found, "Strong was unable to gain access to library materials that would have enabled him to learn the correct deadline, because of the aforementioned rules that gave library access only to those considered to have imminent deadlines." *Id.* at 1040. The Court concluded that "[t]he miscalculation of the due date for Strong's habeas petition by prison personnel and the resulting inaccessibility to Strong of the statute of limitations qualifies as state action impeding Strong from timely filing his petition within the meaning of [28 U.S.C. §] 2244(d)(1)(B) and/or the doctrine of equitable estoppel and/or tolling." *Id.* at 1042.

Gaetz then moved to reconsider, asking to supplement the factual record relating to Strong's assertions. As indicated earlier, the Court determined that Gaetz's motion

4

required an evidentiary hearing and appointed counsel to represent Strong. The Court then held an evidentiary hearing at which Strong, head law librarian Krista Allsup (formerly Krista Schorn), inmate law clerk Brian Triplett-Daniels, and inmate law clerk Larry Johnson testified.[1] The parties also offered numerous exhibits. The Court finds the facts as follows.

**1.  Lockdowns at Menard prison**

In the period following the denial of Strong's post-conviction PLA, the South Lower cell house at Menard Correctional Center, where Strong resided, was placed on lockdown for significant periods. At Menard, lockdowns are designated by levels – 1 through 4 – corresponding to the restrictions that apply. The two types of lockdowns relevant in this case are level 1 and level 4 lockdowns. During level 1 lockdowns, all prisoners are confined to their cells. Level 4 lockdowns are less restrictive, but prisoners are still unable to go to the law library.

The time line for lockdowns from January 25, 2006 through January 31, 2007 is as follows:

- **January 25 - February 2006** - eleven days on lockdown

    - January 30 - February 1 - level 1
    - February 2-5 - level 4
    - February 13-15 - level 1
    - February 16 - level 4

- **April 2006** - sixteen days on lockdown

    - April 7-11 - level 1

---

[1] Johnson's testimony was presented via deposition.

5

- April 19-20 - level 4
- April 21-24 - level 4

- **May 2006** - eight days on lockdown

    - May 12-13 - level 1
    - May 14-19 - level 4

- **June - September 2006** - 101 days on lockdown

    - June 2-9 - level 1
    - June 12 - July 19 - level 4
    - July 21 - August 9 - level 1
    - August 10 - September 13 - level 4

- **November 2006** - three days on lockdown

    - November 11-13 - level 1

- **December 2006** - one day on lockdown

    - December 31 - level 1

- **January 2007** - two days on lockdown

    - January 30-31 - level 1

2. **Access to the Menard law library**

Inmates at Menard have limited access to the prison's law library even when their cell block is not on lockdown. As a general rule, an inmate may gain access to the law library only via a written request. The prison maintains a daily "call list" of inmates approved for a law library visit. An inmate may request a visit through a handwritten request sent via the prison mail system or by completing a visit request form at the law library.

The imminence of inmates' deadlines determines who gets law library access and who has to wait. Inmates with imminent court deadlines are given automatic library

access, that is, without the need to make a request. Such inmates also get priority over inmates without imminent deadlines. If an inmate has a court deadline between ninety and sixty days away, he is automatically placed on the call list once per week. If an inmate's deadline is less than sixty days away, he is placed on the call list twice per week. The Court will discuss momentarily how the prison determines whether an inmate has an imminent court deadline.

An inmate who is in a cell block that is on lockdown status is not permitted to leave his cell to go to the law library or elsewhere, even if he has an imminent court deadline. During deadlock periods, paralegal assistant Allsup, the IDOC employee who runs the Menard law library, goes to the affected cell blocks to meet with inmates with imminent court deadlines who are on a list of those have asked to see her. These are called deadlock tours. If the institution is on a level 1 lockdown, Allsup does the deadlock tour herself, because all inmates are confined to their cells. During level 1 lockdowns, inmates with "known verifiable . . . imminent deadlines" are provided limited services at their cells, including providing forms to seek extensions of time,[2] envelopes, and notary services. *See* Stipulation [dkt. 71] at 2-3. If the institution is on a level 4 lockdown, Allsup does the deadlock tour along with one or more inmate law clerks, providing the same types of limited at-the-cell services offered during level 1 lockdowns. During level 4 lockdowns, those services likewise are provided at the inmate's cell. *See id.* at 3.

In short, during a lockdown, Allsup and (during a level 4 lockdown) the inmate

---

[2] The habeas corpus statute provides no procedure under which a court may grant an extension of the one-year limitation period.

law clerks who prison authorities have assigned to work at the law library go to the cell blocks that are on lockdown to meet with inmates who have verified imminent court deadlines or who have other pressing needs, for example, to get a document notarized. Allsup takes with her a priority list, prepared from her records of verified inmate deadlines, identifying the inmates she and the inmate law clerks are to visit. Allsup testified, however, that it is not unusual for inmates who are not on the list to call out questions to her during her deadlock tours. She recalled no such interaction with Strong but acknowledged that she does not always keep notes of such encounters.

After a lengthy lockdown period, an inmate without a verified imminent court deadline will have difficulty getting to the law library for some period of time. The reason is that after a lockdown, there tends to be a backlog of inmates with imminent deadlines who have immediate needs for library access. Those inmates get priority, and others go to the back of the line. The duration of such post-lockdown delays depends on the length of the lockdown.

3.   **Calculation of inmates' filing deadlines**

One of the significant issues addressed at the evidentiary hearing concerned how the Menard law library determines whether an inmate has an imminent court deadline. When an inmate requests a library visit and says he has an approaching deadline, he is placed on the call list under "deadline proof" status. This means the inmate must bring documentation imposing a deadline, such as a court order, or a document from which a deadline may be calculated, such as an order denying a petition for leave to appeal.

The evidence established that when an inmate seeking library access does not

have a court order imposing a deadline, prison staff, specifically Allsup, directs the inmate to an inmate law clerk to calculate the deadline. As indicated earlier, determination of the inmate's deadline is required because it determines whether and when the inmate obtains law library access.

Allsup said she is aware there is a deadline for filing a federal habeas corpus petition. Her understanding about how that is calculated, however, was significantly flawed. She believed the petition is due one year after all state court proceedings are completed, and she was unaware that the time between completion of a direct appeal and filing of a state post-conviction petition counts against the one-year deadline. In this regard, Allsup's misunderstanding is consistent with that of most Illinois prisoners, who as a general rule do not realize that period counts against the one-year habeas corpus limitation period.

Allsup's self-prepared description of her job responsibilities includes verifying court deadlines, maintaining a list of inmates with court deadlines, and prioritizing requests for access to the law library. An official description of her job also includes the responsibility of explaining court procedures and filing requirements.

Despite this, Allsup testified that she does not calculate court deadlines and does not assist inmates in doing so. Allsup said she does not know how to calculate a federal habeas corpus filing deadline and had never assisted an inmate in doing so. Inmate law clerk Johnson confirmed Allsup's testimony in this regard and stated that he was unaware of Allsup ever calculating such a deadline. Inmate law clerk Triplett-Daniels, however, gave contrary testimony.

The Court need not resolve this testimonial conflict because, as will become

9

clear, it is unnecessary to do so to determine the issues in Strong's case.  In addition, even if Allsup herself does not calculate deadlines, the evidence was abundant and uncontradicted that she routinely directs inmates to the inmate law clerks to make deadline calculations.  Both inmate law clerks who testified stated unequivocally that they routinely calculated federal habeas corpus filing deadlines for inmates, that Allsup knew they were doing that, and that, indeed, Allsup directed inmates to them for that purpose.  The evidence was equally abundant and uncontradicted that after the inmate law clerk calculated an inmate's filing deadline after a referral from Allsup, Allsup routinely entered the deadline thus calculated into the law library's computer, in which she kept track of filing deadlines.  Allsup used those deadlines, in turn, to determine which inmates had "imminent" deadlines and thus were entitled to priority library access.

**4.     Strong's preparation of his habeas corpus petition**

None of Strong's lawyers – neither his trial counsel, his counsel on direct appeal, nor his appointed counsel on his post-conviction appeal – told him anything about the deadline for filing a federal habeas corpus petition or how to calculate it.  Other inmates told Strong that he had one year to file after his post-conviction PLA was denied.  This information was incorrect.

Strong testified that during one of Allsup's deadlock tours in the late spring or early summer of 2006, he called out to her as she passed his cell.  Strong told her that he needed to file a habeas corpus petition and had just lost his PLA.  He testified that Allsup told him that he had a year to file his habeas corpus petition.  Though Allsup did not recall this conversation, the Court found Strong's testimony credible.  To the extent

Allsup expressly or impliedly denied telling inmates about the one-year habeas corpus deadline, her testimony lacked credibility.[3]

Strong understood Allsup to be telling him – consistent with what the other inmates had said – that the one-year period started to run upon the denial of his PLA. He did not contend, however, that Allsup actually said that. Nor did Strong offer evidence that Allsup or a prison law clerk calculated his deadline, attempted to do so, or told him how to do so. Rather, Strong testified only that Allsup told him he had one year to file. Based on Strong's own testimony, neither his question nor Allsup's response concerned when the one-year period started to run or how it is calculated.

Believing his filing deadline was January 25, 2007, Strong started to prepare his petition around four months before that, in late September or early October 2006. He did not ask to go to the law library to work on the petition between this date and January 25, 2007.[4] Strong testified that during this period, he was trying to put his habeas corpus petition together and did not think he had time to spend in the law library doing legal research. He indicated that he had obtained and reviewed some "case law" prior to September 2006.

As Strong prepared handwritten drafts of the various sections of his petition, he sent them to his grandmother in Arizona to be typed up. He either did not realize that he could submit a handwritten petition to the Court, or he preferred not to do so. It

---

[3] Among other things, Allsup was consistently evasive during her testimony and repeatedly gave non-responsive, self-serving answers to questions by Strong's counsel.

[4] Strong asked to go to the law library for an unrelated reason in December 2006.

appears that Strong's grandmother sent the petition, or at least the last part of it, back to Strong in late December 2006 or early January 2007. Strong signed the petition on January 4, 2007. He then apparently sent the signed petition back to his grandmother, who mailed it to the court clerk for filing, along with the filing fee, on January 19, 2007. *See* Petition at 59 (signature and date) & last page (notice of filing, signed by Strong's grandmother).

5. **Evidence uncovered after the completion of state court proceedings**

After the hearing, Strong filed a motion asking the Court to rule on Gaetz's motion for reconsideration in a way that would not foreclose further factual development of certain of Strong's claims. Strong contends that certain evidence discovered after the completion of his state court proceedings constitutes a new factual predicate that might give rise to a later start date for the one-year limitation period. The claimed new factual predicate arises, in significant part, from the discovery of the murder victim's identity, which was unknown at the time of Strong's trial.

Among other things, Strong has submitted a Carpentersville (Illinois) police report. At the time, Carpentersville police were investigating the victim's disappearance. They interviewed her former husband, who was in custody in Florida. He allegedly stated that he had killed the victim. In addition, Strong has submitted an affidavit by a private investigator retained by his court-appointed counsel, which concerns information obtained via further investigation following the discovery of the victim's identity. Strong has also submitted evidence of a purported recantation by his alleged accomplice in the murder, Jeremy Tweedy, a key prosecution witness at Strong's trial. (Strong's counsel thus far has been unsuccessful in his attempts to

12

further interview Tweedy.)

## Discussion

**1.    Timeliness of Strong's petition**

Under 28 U.S.C. § 2244(d)(1),

> A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of –
>
> (A)  the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B)  the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action; [or]
>
> . . .
>
> (D)  the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1).

Strong's conviction became final on May 6, 2003, when the time for filing a petition for a writ of certiorari regarding his direct appeal expired. If that is the date when the limitation period began to run, it stopped running seventy-three days later, on July 18, 2003, when Strong filed his state post-conviction petition. *Id.* § 2244(d)(2). Under this scenario, the one-year limitation period started to run again on January 18, 2006, when the Illinois Supreme Court denied Strong's post-conviction PLA. *See Lawrence v. Florida*, 549 U.S. 327, 332 (2007) (limitation period does not remain tolled during period in which habeas corpus petitioner could have filed a petition for a writ of

13

certiorari on collateral review).  Because seventy-three days had already elapsed, Strong had 292 days remaining of the one-year period.  Thus, absent a basis for a later start date for the one-year period, Strong's federal habeas corpus petition had to be filed by November 13, 2006.  Strong filed his petition on January 25, 2007.

Strong contends he understood Allsup to have told him, incorrectly, that he had one year from the date his post-conviction PLA was denied to file a habeas corpus petition, in other words, until January 25, 2007.  Under this scenario, and given Menard's definition of "imminent" filing deadlines, Strong would not have had an imminent deadline until approximately October 26, 2006.  Strong says that this would not have given him enough time to file a habeas corpus petition by November 13 or even to discover quickly enough that Allsup had given him incorrect information.  Strong argues that the extended lockdown period from June through mid-September 2006 left a large backlog of requests for library access in any event.  He would have been at the end of a very long line and would not have been able to do the research necessary to learn that Allsup had given him bad information, let alone to complete his habeas corpus petition by November 13.  These circumstances, Strong argues, constitute an "impediment to filing [a habeas corpus] application created by State action in violation of the Constitution or laws of the United States" within the meaning of section 2244(d)(1)(B).

The evidence establishes that Menard had and has an institutionalized system under which:

1)    Law library access depends in large part on an inmate's filing deadline and its imminence.

2) Prison personnel have been given responsibility for verifying inmate filing deadlines and determining whether they are imminent.

3) Prison personnel deliberately delegate this responsibility to inmate law clerks who were given their jobs by prison personnel.

4) Pursuant to this delegation, inmate law clerks calculate (among other things) federal habeas corpus filing deadlines for inmates.

5) Prison personnel rely on the deadlines thus calculated to prioritize law library access. This becomes even more significant during and after lockdown periods. During lockdowns, the law librarian focuses primarily on inmates with imminent deadlines. After lockdowns, there are significant backups of inmate requests, and the library gives priority to inmates with imminent deadlines verified as described above, meaning that inmates without imminent deadlines go to the back of the line.

An inmate has the primary responsibility to determine his own deadline. But Menard has rationed access to the tools enabling the inmate to do so (i.e., the law library), particularly given the prevalence of lockdowns. The prison has also institutionalized a system in which inmates are effectively dependent for library access upon deadline calculations made by prison authorities or persons who are directly and indirectly conferred by prison authorities with the responsibility to make those calculations.

Were a prison law clerk or prison staff member to give an inmate, via this institutionalized practice, incorrect information about his filing deadline that caused the inmate to file his federal habeas corpus petition late, that advice, particularly if combined with the resulting prioritization of law library access, would amount to a state-

15

created impediment entitling the inmate to a later start date for the one-year limitation period, or at least a basis for equitable tolling of the limitation period. *See Strong*, 530 F. Supp. 2d at 1040-42. Otherwise the inmate would be placed in a sort of Catch-22 status: unable, until it is too late, to get to the library – the only place where he could determine how to calculate his deadline accurately – due to the incorrect calculation of that deadline by persons conferred by the prison with the authority to do so and thus to restrict law library access.

Strong's case, however, does not present that situation. The most Strong was able to say was that after the denial of his post-conviction PLA, he told Allsup that he wanted to file a federal habeas corpus petition, and she told him he had a year to file. Strong's question was vague, and Allsup's advice was equally vague. Specifically, Strong does not claim that he told Allsup *when* his PLA had been denied or that he asked her when the one-year clock started to run. And he does not claim that Allsup told him that the clock started to run on the date of the PLA denial. Rather, Strong simply assumed that was what he was being told. The Court cannot find, on this record, that Strong got erroneous advice from Allsup or anyone else delegated authority by prison personnel to calculate filing deadlines.

The Seventh Circuit has made no definitive ruling on what constitutes a state-created impediment under section 2244(d)(1)(B). The court has said, however, that "the plain language of the statute makes clear that whatever constitutes an impediment must *prevent* a prisoner from filing his petition." *Lloyd v. Van Natta*, 296 F.3d 630, 633 (7th Cir. 2002) (emphasis in original). Strong has failed to show that the circumstances he faced prevented him from filing his petition on time. The vague advice he got from

Allsup, the Court has concluded, is not enough. And in any event, that advice did not prevent Strong from gaining access to the law library. Though he had no such access from early June through September 2006 due to lockdowns, Strong made no request for access before or after that period. Thus he has not shown that he was denied access or that his requests for access were ignored or pushed to the end of the queue due to Allsup's alleged incorrect advice. Indeed, based on the testimony at the hearing, it is more likely than not that Strong would have been able to get to the library within a reasonable time after the lockdown ended on September 13, 2006 and significantly before November 13, 2006, if he had made a request for library access.

Strong also argues that he is entitled to equitable tolling of the limitation period due to Allsup's incorrect advice about the amount of time he had to file. "Before the principles of equitable tolling apply, a petition must demonstrate, first, that extraordinary circumstances outside his control and through no fault of his own prevented him from timely filing his petition. Second, he must also show that he has diligently pursued his claim, despite the obstacle." *Tucker v. Kingston*, 538 F.3d 732, 734 (7th Cir. 2008) (citations omitted). Strong is not entitled to equitable tolling for the reasons stated earlier: he has not shown that he was given bad information about his due date by prison authorities or persons they delegated, and he was not precluded from access to the law library.

For these reasons, the Court grants Gaetz's motion for reconsideration [docket no. 28]. Strong's claims are time-barred unless he can show some basis other than section 2244(d)(1)(B) for a later start date for the one-year limitation period, or some basis for equitable tolling other than the incorrect advice he claims to have received

from prison legal staff.

**2.     Further factual development**

After the conclusion of the hearing, Strong asked the Court to allow him to develop a complete factual record concerning a separate possible basis for a later start date for the one-year limitation period. As noted earlier, the one-year limitation period does not begin until "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence," 28 U.S.C. § 2244(d)(1)(D), if that date is later than the other start dates listed in section 2244(d)(1). Strong contends that the belatedly-discovered identity of the murder victim, now known to be Mary Kate Sunderlin, and the recantation by key prosecution witness Jeremy Tweedy constitute a factual predicate for at least some of his claims that, in turn, provides for a start date for the one-year period that would save those claims from being time-barred.

Under section 2244(d)(1)(D), "[t]ime begins when the prisoner knows (or through diligence could discover) the important facts, not when the prisoner recognizes their legal significance." *Owens v. Boyd*, 235 F.3d 356, 359 (7th Cir. 2000). Strong learned in February 2006 that the murder victim's identity had been discovered. Gaetz has not argued that he could have discovered her identity earlier with due diligence. Strong filed his petition on January 23, 2007, along with a motion asking to stay proceedings so that he could pursue new avenues of investigation and, if appropriate, pursue a second state post-conviction petition. Strong's original petition did not rely on the new information, but it did include a claim of ineffective assistance of counsel for failure to conduct an adequate investigation, along with a claim that the state had knowingly

18

presented false testimony by Tweedy. On May 31, 2007, Strong filed an amended petition adding the claim that counsel's failure to investigate evidence that incriminated another suspect deprived him of the right to effective assistance of counsel. The amended petition referred to "new information that came about last year." Am. Pet. at 6.

Gaetz argues that Strong's claims relating to the victim's identity are untimely because they do not relate back to the date he filed his original petition. Contrary to Gaetz's assertion, however, the discovery of the victim's identity is tied to, and may support, Strong's claim that his counsel failed to conduct an adequate investigation. As a result, that claim (and, perhaps, other claims) relates back to the original petition. *Mayle v. Felix*, 545 U.S. 644, 664 (2005) ("So long as the original and amended petitions state claims that are tied to a common core of operative facts, relation back will be in order."). Unlike the factual predicate that was the subject of petitioner's claim in *Escamilla v. Jungwirth*, 426 F.3d 868, 871 (7th Cir. 2005), which Gaetz cites, the discovery of the victim's identity does more than merely corroborate information already known at trial.

## Conclusion

For the reasons stated above, the Court grants respondent's motion for reconsideration [docket no. 28]. The Court will, however, allow Strong a reasonable amount of time to investigate and conduct discovery concerning claims that may be subject to the later start date provided in 28 U.S.C. § 2244(d)(1)(D). Counsel are directed to confer so that they can present a proposed discovery plan. The proposed

19

plan is to be presented by letter to chambers, to be submitted by no later than October 26, 2009. The case is set for a status hearing on November 2, 2009 at 9:30 a.m.

                                                _____
                                                MATTHEW F. KENNELLY
                                                United States District Judge

Date: September 21, 2009